**EXHIBIT A TO HARRISS AFFIDAVIT**

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

Chamberlain Louisville, LLC

V.

Hua Lin d/b/a Asian Buffet Group

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

# 07 CIV 8153

# JUDGE BATTS

TO: (Name and address of Defendant)

Hua Lin
24 James Street, Apt. 1A
New York, New York 10038

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

William Dahill
G. Christopher Harriss
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10100
(212) 382-3300

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

(By) DEPUTY CLERK

SEP 1 8 2007

DATE

AO 440  (Rev. 8/01)  Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

    I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____      _____
                Date                *Signature of Server*

                          _____
                          *Address of Server*

---

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

JUDGE BATTS                           07 CIV 8153

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                            :        RECEIVED
CHAMBERLAIN LOUISVILLE, LLC,                :        SEP 18 2007
                                            :        Civil Action
                Plaintiff,                  :        U.S.D.C. S.D. N.Y.
                                            :        COMPLAINTIERS
            -against-                       :
                                            :
HUA LIN, d/b/a                              :
ASIAN BUFFET GROUP                          :
                                            :
                Defendant.                  :
                                            :
-----------------------------------------------------------x

Plaintiff Chamberlain Louisville, LLC ("Chamberlain"), for its complaint (the "Complaint") against Defendant Hua Lin, d/b/a Asian Buffet Group ("Defendant"), alleges upon knowledge as to its own acts and upon information and belief as to all other matters as follows:

### JURISDICTION AND VENUE

1.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states, and the amount in controversy is in excess of $75,000.00.

2.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) (1) on the grounds that Defendant is a resident of this judicial district.

### PARTIES

3.    Plaintiff, Chamberlain Louisville, LLC is an Indiana limited liability company with its primary office located at 8463 Castlewood Drive, Indianapolis, Indiana 46250.

4.    Defendant Hua Lin is an individual residing at 24 James Street, Apt. 1A, New York, New York 10038.

## COUNT I
### (Breach of Contract)

5.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1-4 as if fully set forth herein.

6.    On or about August 1, 2006, Defendant entered into a Retail Lease Agreement with KJS, LLC, Chamberlain's predecessor in interest, ("Lease") for certain real estate located at 11300 Chamberlain Lane, Louisville, Kentucky (the "Leased Premises").  A true and accurate copy of the Lease is attached hereto as Exhibit A, and is, by reference, incorporated herein.

7.    The term of the lease is for five (5) years.

8.    Pursuant to Article 3 of the Lease, Defendant is required to make payments of "Minimum Rent" and "Additional Rent" (collectively "Rental") on a monthly basis.

9.    Article 20(G) of the Lease provides that all Rental installments shall be subject to a $200.00 late fee once they are more than ten (10) days late.  All sums due and owing shall also accrue interest at the rate of eighteen percent (18%) per annum until paid in full once such amounts are more than fifteen (15) days late.

10.    Article 20(D) of the Lease provides that Chamberlain is entitled to an award of its reasonable attorney's fees incurred as a result of Defendant's default.

11.    Pursuant to Article 7(B) of the Lease, Defendant is required to continuously operate at Leased Premises.  In the event that Defendant does not continuously operate at the Leased Premises, Defendant is required to pay Chamberlain an amount equal to one hundred fifty percent (150%) of the regular Minimum Rent to Chamberlain.

2

12.    Defendant has failed to make Rental payments pursuant to the Lease since February, 2007.

13.    Defendant has not operated on a continuous basis since at least May 9, 2007.

14.    As a direct and proximate result of Defendant's defaults under the Lease, Chamberlain has been and continues to be damaged in an amount to be proved at the trial of this action.

15.    On or about July 5, 2007, counsel for Chamberlain notified Defendant of its defaults under the Lease, which then constituted at least $35,096.55 in past due rent, plus late fees, interest and attorneys' fees.  A true and accurate copy of this letter is attached hereto as Exhibit B and is, by reference, incorporated herein.

16.    Despite due demand, Defendant has failed and continues to fail to cure its defaults under the Lease.

17.    As a direct and proximate result of Defendant's continuing defaults under the Lease, the Lease is eligible for termination.

18.    Pursuant to Article 20(D) of the Lease, upon termination of the Lease, Defendant is liable to Plaintiff in an amount including, but not limited to, "the amount of rent and charges equivalent to the rent reserved in [the] Lease for the remainder of the Lease Term over the then reasonable rental value of the Leased Premises for the remainder of the Lease Term.  All such amounts shall be immediately due and payable from [Defendant] to [Plaintiff]."

## COUNT II
### (Conversion)

19.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1-18 as if fully set forth herein.

3

20.     Upon vacating the Leased Premises, Defendant removed several items that were fixtures to the Leased Premises and the property of Plaintiff (the "Fixtures").

21.     Defendant removed the Fixtures with the intent to exert control over them.

22.     Defendant's actions in removing the Fixtures was unauthorized.

23.     Pursuant to Article 25 of the Lease, Defendant consented to the Lease being governed by Indiana law.

24.     Defendant has knowingly and/or intentionally exerted control over the Fixtures, which actions constitute conversion pursuant to Ind. Code § 35-43-4-3.

25.     Upon information and belief, the value of the Fixtures unlawfully removed by Defendant exceeded $20,000.

26.     Pursuant to Ind. Code § 34-24-3-1, any person that has suffered loss as a result of any violation of Ind. Code § 35-43-4-3 is entitled to treble damages as well as an award of attorney's fees and costs resulting from such loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chamberlain Louisville, LLC respectfully requests that the Court grant the following relief:

A.     A judgment on account of the Lease in favor of Chamberlain Louisville, LLC and against Defendant Hua Lin, d/b/a Asian Buffet Group, in an amount to be determined at trial plus all accrued interest, late fees, utilities, and real and personal property taxes;

B.     An order adjudging the Lease to be terminated;

C.     An award of Chamberlain's damages resulting from Defendant's conversion of Chamberlain's property as well as treble damages pursuant to Indiana statutes;

D.     An award of Chamberlain's reasonable attorney's fees incurred in this matter;

E.   The costs of this action;

F.   Pre- and post-judgment interest at the applicable rate; and,

G.   All such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 18, 2007
        New York, New York

WOLLMUTH MAHER & DEUTSCH LLP

By: _____
        William F. Dahill (WD-8618)
        G. Christopher Harriss (GH-0284)
    500 Fifth Avenue
    New York, New York 10110
    (212) 382-3300

*Attorneys for Plaintiff Chamberlain Louisville, LLC*

5

# Exhibit
# A

### RETAIL LEASE AGREEMENT

**THIS LEASE AGREEMENT** ("Lease") is made as of this 1st day of August 2006 by and between KJS, LLC d/b/a Chamberlain Plaza an Indiana limited liability company ("Landlord"), and Asian Buffet Group and Hua Lin Guarantor ("Tenant").

### ARTICLE 1
### BASIC LEASE PROVISIONS

A.  **Shopping Center Address ("Center"):** 11300 Chamberlain Lane Louisville, KY 40241.

B.  **Leased Premises:** Approximately 5,250 rentable square feet, the approximate location of which is shown cross-hatched on the site plan of the Center attached hereto as Exhibit "A".

C.  **Commencement Date:** The earlier of (i) the date that Landlord delivers possession of the Leased Premises, or (ii) the Rent Commencement Date (defined below).

D.  **Rent Commencement Date:** 90 days after Landlord delivers possession of the Leased Premises to Tenant in "as is" condition..

E.  **Term:** The term of this Lease shall commence on the Commencement Date and shall expire Five (5) years thereafter (the "Expiration Date").

(1)  Provided that Tenant is not in default on any of the terms and conditions of this Lease, Tenant shall have the option to renew this Lease for One(1) additional term of Five (5)years ("Renewal Term"). Upon the exercise of any Renewal Term hereunder, Minimum Rent (defined below) shall be increased in accordance with the Minimum Rent schedule below.

(2)  Tenant shall exercise its option hereunder by providing Landlord with written notice thereof no later than six (6) months prior to the expiration of the Term or any Renewal Term.

F.  **Permitted Use:** Chinese Buffet Restaurant and no other use without the express written consent of Landlord, which may be withheld in Landlord's sole discretion. Landlord represents that the Permitted Use will not violate any agreement to which Landlord is bound, including exclusives granted to other tenants of the Center.

G.  **Minimum Rental:**

|  | | Original Term: | |
| --- | --- | --- | --- |
| Lease Year | Rate/sf | Monthly Rent | Annual Rent |
| 1 | $13.00 | $5,687.50 | $68,250.00 |
| 2 | $13.00 | $5,687.50 | $68,250.00 |
| 3 | $13.00 | $5,687.50 | $68,250.00 |
| 4 | $13.30 | $5,818.75 | $69,825.00 |
| 5 | $13.60 | $5,950.00 | $71,400.00 |

Renewal Term:

| Lease Year | Rate/sf | Monthly Rent | Annual Rent |
|------------|---------|--------------|-------------|
| 1 | $13.90 | $6,081.25 | $72,975.00 |
| 2 | $14.20 | $6,212.50 | $74,550.00 |
| 3 | $14.50 | $6,343.75 | $76,125.00 |
| 4 | $14.80 | $6,475.00 | $77,700.00 |
| 5 | $15.10 | $6,606.25 | $79,275.00 |

As used herein, the term "Lease Year" shall mean a period of 12 consecutive months beginning on the Commencement Date and running through the anniversary thereof. If prior to the Commencement Date, either party notifies the other that the Leased Premises contains more or less than the rentable square footage set forth above, the Minimum Rent shall be ratably modified.

**H.**   **Operating Cost Percentage ("Proportionate Share"):** 17.7%

**I.**   **Security Deposit:** $7,262.50

**J.**   Improvement Allowance: $00.00

**K.**   Guarantor:

Hua Lin
130 W. Tiverton Way #109
Lexington, KY 40503


**L.**   Notice Addresses: Landlord:

| | |
|---|---|
| | KJS, LLC d/b/a Chamberlain Plaza |
| | 8463 Castlewood Drive |
| | Indianapolis, Indiana 46240 |
| With copies to: | Donald J. Smith, Esq. |
| | Stark Doninger & Smith |
| | 50 South Meridian Street |
| | Suite 700 |
| | Indianapolis, Indiana 46204 |
| and: | Maquina Realty Corp. |
| | 8900 Keystone Crossing, Suite 650 |
| | Indianapolis, Indiana 46240 |
| Tenant: | Asian Buffet Group |
| | C/O Hua Lin |
| | 130 W. Tiverton Way,#109 |
| | Lexington, KY 40503 |

## ARTICLE 2
## LEASED PREMISES, TERM AND COMMENCEMENT DATE

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Leased Premises for a term ("Term") commencing on the Commencement Date and ending on the Expiration Date, as set forth in Article 1, unless sooner terminated as provided herein, and subject to the conditions herein contained.

## ARTICLE 3
## RENT

**A.    Minimum Rent:** Beginning on the Rent Commencement Date, Tenant shall pay to Landlord the monthly Minimum Rent as set forth in Article 1.

**B.    Additional Rent:** Beginning on the Commencement Date, Tenant shall, pay its proportionate share of operating costs for the Center ("Additional Rent").

**C.    Payment of Rent:** All installments of Minimum and Additional Rent, and any other amounts that Tenant is obligated to pay Landlord under this Lease (collectively referred to as "Rent") shall be paid, in advance, at the address set forth for notices to Landlord in this Lease, on or before the first day of each month of the Term of this Lease or any extension thereto. All amounts of Rent shall be paid without any deduction, recoupment, set-off or counterclaim except as otherwise set forth herein. In the event that the Commencement Date or Expiration Date are other than the first or last day, respectively, of any calendar month, all amounts of Rent shall be prorated on a per diem basis for such calendar months.

~~**D.    Reporting of Sales:    Tenant shall provide Landlord with a report showing its gross sales generated from its Permitted Use of the Leased Premises.  Tenant shall provide such report on a bi-annual basis, on July 1 of each year, and no later than January 31.  In the event that Tenant is one month or more delinquent in its payments of Rent, Tenant shall provide such reports on a monthly basis along with its regular Rent payments.  Failure to provide the reports required in this paragraph shall be an event of default under this Lease.~~**

## ARTICLE 4
## TAXES AND OPERATING COSTS

**A.    Taxes:** Tenant shall pay, as Additional Rent, an amount equal to Tenant's Proportionate Share of the real estate and other property taxes on the Center as set forth below.

**B.    Operating Costs:** Beginning with the Commencement Date, Tenant shall pay, as Additional Rent, an amount equal to Tenant's Proportionate Share of Operating Costs for the Center in the manner described below.  For purposes of this Lease, "Operating Costs" shall be defined as: the total cost and expense incurred in operating, managing, insuring, equipping, lighting, repairing, replacing and maintaining the Common Area (defined herein), or repairing, maintaining r replacing the foundation, roof, exterior walls, gutters, or down spouts of any portion of the Center, or causing the Common Area to be in compliance with all federal, state, municipal and other applicable laws, but specifically including without limitation, gardening and landscaping, painting, seasonal decorations, utility systems, landscaping irrigation systems, security, fire and safety monitoring systems, traffic control equipment, Landlord's Insurance (defined below), repairs, maintenance, line painting, lighting, sanitary control, removal of snow, trash, rubbish, garbage and other refuse, repair and replacement of paving, electricity for lighting the pylon Center sign (if any) or any part thereof, cost of supplies, cost of, depreciation on, or rentals of machinery and equipment used in such maintenance, cost of personnel to implement maintenance, to direct parking, to act as security guards, and to police the Common Area, the cost of providing a storage

and maintenance room, and cost and expense incurred in common lighting the signs of tenants in the Center by Landlord. Tenant shall also pay Landlord its Proportionate Share of Landlord's costs to hire a professional management company to manage the Center ("Management Fee"), which Management Fee shall be calculated on five percent (5%) of the gross rental (minimum and additional rent combined) receipts generated from the Center on an annual basis.

    C.    <u>Manner of Payment</u>: Taxes and Operating Costs shall be paid in the following manner:

    (1)    Landlord may reasonably estimate, in advance, the amounts that Tenant shall owe for Taxes and Operating Costs for any full or partial calendar year of the Term or any extension thereto. In such event, Tenant shall pay, in advance, on a monthly basis, as Additional Rent, an amount equal to one-twelfth (1/12) of such estimated amount. Landlord may reasonably adjust such estimated amount from time to time during the Term.

    (2)    Within one hundred twenty (120) days after the end of each calendar year, Landlord shall provide Tenant with a statement (the "Statement") showing (a) the amount of actual Taxes and Operating Costs for such calendar year, and (b) any amount paid by Tenant on an estimated basis during such calendar year.

    (3)    If the Statement shows that Tenant's estimated payments were less than the actual Taxes and Operating Costs, Tenant shall pay such amount to Landlord within thirty (30) days of Tenant's receipt of the Statement.

    (4)    If the Statement shows that Tenant's estimated payments were more than the actual Taxes and Operating Costs, Tenant shall receive a credit for the difference against the next due payment of Taxes and Operating Costs. In the event that the Lease has terminated, Landlord shall include such difference along with the Statement.

    D.    <u>Finality of Statement</u>: If Tenant does not make any objection, in writing, to the Statement within thirty (30) days of its receipt of the same, the Statement shall be considered final and binding on Tenant. Subject to the resolution of any such objections, Tenant shall continue paying its Proportionate Share of Taxes and Operating Costs subject to any adjustments made after the resolution of any objections to the Statement. In the event that Landlord and Tenant are unable to resolve any such objections through negotiations, Tenant shall have the right, during normal business hours, and at its sole cost and expense, to examine and audit the books and records of Landlord as they relate to Taxes and Operating Costs. In the event that Landlord does not object to such audit, in writing, within ten (10) business days after the delivery from Tenant, the audit shall be binding on both Landlord and Tenant. In the event that Landlord objects to the audit, a third party neutral arbitrator, agreed upon by both parties shall resolve the dispute. The costs of such arbitration shall be borne equally by both parties and the arbitrators decision shall be binding on both parties.

**ARTICLE 5**
**CONDITION OF LEASED PREMISES**

Tenant agrees to accept the Leased Premises "as is".

**ARTICLE 6**
**IMPROVEMENTS, TRADE FIXTURES AND LIENS**

**A.**    **Approval:** Tenant shall not make any structural additions, changes or alterations to the Leased Premises without the prior written consent of Landlord, which consent may be withheld or granted in Landlord's sole and absolute discretion. Notwithstanding the foregoing, Tenant may, at its own cost and expense, from time to time, make such non-structural alterations or changes in and to the Leased Premises as it deems necessary or suitable. The term "non-structural" as used herein, includes the moving of non-load bearing walls or partitions, minor plumbing or electrical work, modification and rearrangement of trade fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in the obtaining of any building or other permits and/or approvals required for any work permitted hereunder.

**B.**    **Liens:** Tenant shall keep the Center and the Leased Premises free from an mechanic's, materialman's or similar liens or encumbrances, and any claims therefor, in connection with any of Tenant's Work. Tenant shall remove such lien or claim, by bond or otherwise, within twenty (20) days after receipt of notice of the same from Landlord. Should Tenant fail to remove such lien or claim within such twenty (20) day period, Landlord may take such action as Landlord deems necessary to remove such lien or claim, without being responsible for investigating the validity of such claim. Any amounts so paid by Landlord shall be deemed to be Additional Rent under this Lease and shall be payable upon demand, without limitation as to any other remedies available to Landlord hereunder.

### ARTICLE 7
### OCCUPANCY AND USE REQUIREMENTS

**A.**    **Use and Compliance with Laws:** Tenant shall use the Leased Premises for the purpose specified in Article 1 and any other lawful retail use not in violation of any exclusive use restrictions in written leases between Landlord and other tenants as of the date of this Lease. Notwithstanding the foregoing, Tenant shall not use the Leased Premises for any use that is specifically disallowed pursuant to Exhibit "C" attached hereto. Tenant, its employees, agents, invitees and permitees shall at all times comply with the Rules and Regulations of the Center, attached hereto as Exhibit "D". Tenant represents and warrants that it shall operate its business in compliance with all laws as they pertain to Tenant's Permitted Use. Landlord makes no representations that Tenant's Permitted Use is allowed by zoning or other land use laws or regulations, and Tenant shall make such determinations as it deems appropriate.

**B.**    **Continuous Use by Tenant:** Tenant shall proceed with due diligence to open for business in the Leased Premises on or before the Commencement Date and upon opening shall continuously, actively and diligently operate its business in the whole of the Leased Premises in a reputable manner, maintaining in the Leased Premises a full staff of employees and a full and proper stock of merchandise during Regular Business Hours (defined below) throughout the Term unless prevented from doing so by fire, strikes or other conditions beyond Tenant's control; provided, in all events, Tenant is diligently pursuing to open for business in the Leased Premises. For purposes of this Lease, "Regular Business Hours" shall mean 10:00 a.m. to 6:00 p.m., Monday through Saturday, or such other business hours as may be reasonably determined by Landlord.

In the event Tenant fails to open for business within thirty (30) days after the Commencement Date or fails thereafter to remain open for business at least during Regular Business Hours throughout the Term of this Lease, then Landlord, in addition to, and not limitation of, any remedies provided herein or by law, may at its option, charge Tenant, as Rent for each month the Leased Premises is not open as provided herein, an amount equal to one hundred fifty percent (150%) of the Minimum Rent provided herein.

### ARTICLE 8
### UTILITY SERVICES

**A.    Payment by Tenant:** Beginning on the Commencement Date, Tenant shall arrange, at its own cost and expense, for the connection to and payment of all utilities furnished to or for the Leased Premises, including without limitation, electricity, gas, water, sewer, telephone and other communication services.

**B.    Installation, Connection and Use of Utility Equipment:** Landlord agrees that it shall provide the proper connections to utilities which are necessary for Tenant's Permitted Use. It shall be Tenant's responsibility, at its sole cost and expense to connect all of its equipment to such lines and to maintain and replace all utility lines and equipment located inside the Leased Premises. Tenant shall at all times keep the Lease Premises sufficiently heated so as to avoid the freezing and bursting of pipes.

**C.    Suspension of Services:** Landlord shall reserve the right to suspend the service of utilities to the Leased Premises when necessary for reason of repair, alteration or other improvements which are, in the reasonable judgment of Landlord, desirable or necessary, or may be caused by reason beyond Landlord's control. Landlord shall not be liable for any such suspension unless the same results from Landlord's negligence or misuse, and Tenant shall not be entitled to terminate this Lease or abate any portion of Rent due hereunder as a result of such suspension.

### ARTICLE 9
### MAINTENANCE AND REPAIR OF LEASED PREMISES

**A.    Tenant's Maintenance and Repairs:** Tenant shall keep the interior, non-structural portions of the Leased Premises in good working order and repair and condition, except to the extent provided to the contrary in this Lease respecting casualty damage. Tenant's obligations hereunder shall include without limitation, Tenant's trade fixtures and equipment, security system, entry and interior doors, including all equipment related thereto, ceilings, non-structural walls, signs, interior decorations, floor coverings, wall coverings, exterior and interior glass (including plate glass doors or windows), plumbing fixtures, light fixtures, keys and locks, fire extinguishers, fire protection systems, HVAC as described below, electrical equipment that are located inside the Leased Premises and all alterations and improvements made to the Leased Premises by Tenant.

**B.    HVAC Maintenance:** Tenant, at Tenant's sole cost and expense, shall procure a periodic maintenance contract with a competent, licensed contractor reasonably approved by Landlord to service the heating and air conditioning ("HVAC") equipment for the Leased Premises. Such contract shall provide for the servicing of the HVAC system at least every ninety (90) days. Upon request, Tenant shall provide Landlord with copies of all HVAC maintenance contracts along with written evidence satisfactory to Landlord that such maintenance has been completed and paid for. At Landlord's option, Landlord may contract for such services and bill the cost therefor back to Tenant as part of the Operating Costs hereunder.

**C.    Landlord's Maintenance and Repairs:** Landlord shall keep and maintain all Common Areas as well as portions of the Center (other than the interior of the Leased Premises, Tenant's storefront, Tenant's window's and signage, and the interior of other rentable areas of the Center) in good condition and repair and Tenant shall reimburse Landlord for Tenant's Proportionate Share of Landlord's costs incurred therein. Landlord's area of responsibility shall include, without limitation, the foundation, exterior walls (excluding windows, doors, window and door frames and plate glass), structural columns, roof, gutters and down spouts, parking area surface as well as all landscaped and sodded areas.

### ARTICLE 10
### COMMON AREAS

- 6 -

**A.**    **Definition of Common Area**: As used in this Lease, "Common Area" shall mean all areas of the Center made available by Landlord for the general use or benefit of Tenant and other parties as they currently exist and as they may be changed from time to time subject to the limitations described in this Lease.

**B.**    **Use of Common Areas**: Tenant and Tenant's employees, invitees and licensees may use the Common Area on a non-exclusive basis in common with all other parties to whom the right to such Common Areas has been or is granted, subject to the following conditions: (1) Tenant shall not conduct business in the Common Areas or make any use of the Common Areas that interferes in any way with the use of the Common Areas by other parties; (2) Tenant's use of the Common Areas shall be subject to the other provisions of this Lease; and (3) Tenant's right to use the Common Areas shall terminate upon the expiration or earlier termination of this Lease or Tenant's right to possession of the Leased Premises.

**C.**    **Common Area Maintenance and Control**: Landlord shall administer, operate, clean, maintain and repair the Common Areas and Tenant shall pay its Proportionate Share of such costs as part of its Operating Costs. Landlord shall have the right to temporarily close reasonable portions of the Common Areas for whatever purposes Landlord may reasonably determine. Notwithstanding anything to the contrary in this Lease, Landlord shall have the right to change or reconfigure the Center or the Common Areas at its discretion.

**ARTICLE 11**
**INSURANCE SUBROGATION AND WAIVER OF CLAIMS**

**A.**    **Tenant's Required Insurance**: Tenant shall maintain during the Term: (1) commercial general liability insurance with limits of not less than $1 Million combined single limit for personal injury, bodily injury or death, or property damage or destruction (including loss of use thereof) per occurrence, with a $2 Million annual aggregate limit; (2) worker's compensation insurance as required by statute; and (3) "all-risk" property damage insurance covering Tenant's inventory, personal property, business records, furniture, floor coverings, fixtures and equipment, and plate glass windows and doors for damage or other loss caused by fire or other casualty or cause, including without limitation, vandalism and malicious mischief, theft, explosion, business interruption and water damage of any type, including sprinkler leakage, bursting and stoppage of pipes. Tenant's policies listed hereunder shall list Landlord and any other party that Landlord may designate as additional insureds and shall not be cancelable without ten (10) days notice to Landlord. If Tenant is permitted to sell liquor as all or any part of its operation of the Leased Premises, Tenant shall also carry liquor liability insurance with a responsible insurance company in an amount satisfactory to Landlord, naming Landlord as an additional named insured, and shall provide Landlord with a certificate of insurance evidencing such coverage.

**B.**    **Certification, Subrogation and Other Matters**: Tenant shall provide to Landlord, prior to the Commencement Date, certificates evidencing the coverages required herein. The parties hereby mutually waive all rights and claims against each other for all losses covered by their respective insurance policies and waive all rights of subrogation of their respective insurers.

**C.**    **Waiver of Claims**: Except for claims arising from Landlord's intentional or grossly negligent acts that are not covered by Tenant's insurance, Tenant waives all claims against Landlord for injury or death to persons, damage to property or to any other interest of Tenant sustained by Tenant or any other party claiming by or through Tenant resulting from: (1) any occurrence in or upon the Leased Premises; (2) the leaking of roofs, bursting, stoppage or leaking of water, gas, sewer or steam pipes or other equipment, including sprinklers; (3) wind, rain, snow, ice, flooding, freezing, fire, explosion, earthquake, excessive heat or cold, or other casualty, (4) the Center or the Leased Premises having a

defective, out of repair or failing condition, and (5) vandalism, malicious mischief, theft or other acts or omissions of any other parties, including without limitation, other tenants, contractors and invitees of the Center.

    **D.**    <u>Landlord's Required Insurance</u>: Landlord shall maintain at all times during the Term of this Lease ("Landlord's Insurance"):

    **(1)**    standard all-risk property insurance with an extended coverage endorsement covering the Center and the leasehold improvements to the Leased Premises (except for any alterations by Tenant after the Commencement Date), furnished and installed in an amount equal to one hundred percent (100%) of the full insurable value thereof; and

    **(2)**    commercial general liability insurance (with deductibles not in excess of commercially reasonable amounts) in amounts to be determined by Landlord in its sole and absolute discretion.

During the Term of this Lease, Tenant shall pay to Landlord, as Additional Rent hereunder, its Proportionate Share of the costs of such insurance, which amount shall include fifteen percent (15%) of the costs of such insurance to cover Landlord's administrative and overhead costs.

## ARTICLE 12
## CASUALTY DAMAGE

    **A.**    <u>Restoration by Landlord</u>: If the Leased Premises shall be partially or totally destroyed by fire or other casualty, Landlord shall have the option, at its sole and absolute discretion, to use available insurance proceeds to repair and restore the Leased Premises to the "vanilla box" condition as existed on the Commencement Date or to terminate this Lease as hereafter provided; provided, however, that should Landlord act to restore the Leased Premises, Landlord shall not be required to repair or replace any of Tenant's furniture, furnishings, fixtures or equipment, or any alterations or improvements made by Tenant after the Commencement Date. Landlord shall notify Tenant, in writing, of its election to either rebuild and restore the Leased Premises, or to terminate this Lease within forty-five (45) days of the event causing such damage. Landlord shall not be liable for any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business resulting in any way from such damage or the repair thereto.

    **B.**    <u>Abatement of Rent</u>: Unless the damage caused to the Leased Premises is caused by vandalism or burglary, all Rent shall abate from the date of the casualty through the date that is thirty (30) days after Landlord has notified Tenant that the repair of the Leased Premises has been substantially completed, provided that such abatement shall only apply to the extent that the Leased Premises are untenantable for the purposes permitted under this Lease and not used by Tenant, based proportionately on the square footage of the Leased Premises so affected and not used.

    **C.**    <u>Termination of Lease</u>: Notwithstanding the foregoing to the contrary, Landlord may elect to terminate this Lease on thirty (30) days notice to Tenant, given within forty-five (45) days of the event causing the damage to the Leased Premises if (1) the damage to the Center exceeds twenty-five percent (25%) of the replacement value of the Center; (2) the damage occurs less than one year prior to the end of the Term; or (3) any or all of the Center is damaged to such an extent that the Center cannot be operated as an integrated unit.

## ARTICLE 13
## CONDEMNATION

If any portion of the Leased Premises , or at least twenty-five percent (25%) of the rentable square footage of the Center are taken by power of eminent domain or condemnation by a competent authority or a conveyance in lieu thereof ("Condemnation") this Lease may, at Landlord's option, be terminated as of the date of such taking, provided that Landlord has provided Tenant with written notice of such termination no less than sixty (60) days prior to the date of such taking. If the entire Center, or such portion of the Leased Premises such that the Leased Premises is untenantable, is taken by Condemnation, this Lease shall automatically terminate as of the date of such taking. Landlord shall be entitled to receive the entire award or payment in connection with such Condemnation; provided, however, that Tenant shall have the right to file any separate claim available to Tenant for moving expenses and any taking of Tenant's personal property, provided such award is separately payable to Tenant.

## ARTICLE 14
## RETURN OF POSSESSION

At the expiration or earlier termination of this Lease, or of Tenant's right of possession, Tenant shall surrender possession of the Leased Premises in as good a condition as they were in as of the Commencement Date, ordinary wear and tear or damage resulting from casualty excepted, and shall ensure that all moveable trade fixtures and personal property are removed. All leasehold improvements and other non-trade fixtures shall become Landlord's property. In the event that Tenant fails to remove all of its trade fixtures and personal property from the Leased Premises, all such items shall immediately become the property of Landlord and shall be disposed of in whatever manner as shall be deemed appropriate by Landlord.

## ARTICLE 15
## HOLDING OVER

Tenant shall pay Landlord an amount equal to two hundred percent (200%) of the amount of Minimum Rent then applicable in the event that Tenant shall remain in possession of the Leased Premises or any part thereof after the expiration or earlier termination of this Lease. Except as otherwise provided herein, upon Tenant becoming a hold over tenant hereunder, Tenant shall be treated as a tenant from month-to-month, subject to the terms and provisions of this Lease.

## ARTICLE 16
## SUBORDINATION, ATTORNMENT AND MORTGAGEE PROTECTION

A.     This Lease shall automatically, at all times, be subject, subordinate and inferior to any mortgagee that may be placed on the Center or the Leased Premises. Tenant shall, upon demand, execute any instrument reasonably necessary to evidence such subordination.

B.     In the event that (1) any proceedings are brought for foreclosure, or (2) of the exercise of the power of sale under any mortgage or deeds of trust, then upon any such foreclosure or sale, Tenant agrees to attorn to any such beneficiary or purchaser, provided that Tenant's right to possession continues unabated and Tenant's rights under this Lease continue undiminished.

## ARTICLE 17
## ESTOPPEL CERTIFICATE

tenant shall, within fifteen (15) days after written request from Landlord, execute, acknowledge and deliver a statement: (1) certifying that this Lease is unmodified and in full force and effect or, if modified, stating the nature of such modification and certifying that the Lease as so modified is in full

- 9 -

force and effect, and the dates to which Rent hereunder has been paid, and the amount of any Security Deposit, and (2) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord, or specifying such defaults if any are claimed. If Tenant shall fail to execute and return such statement within the time required herein, Tenant shall be in default of this Lease.

## ARTICLE 18
### ASSIGNMENT AND SUBLETTING

Tenant shall not, without the express written consent of Landlord, which consent shall not be unreasonably withheld: (1) assign, mortgage, pledge, hypothecate, encumber, permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, by operation of law or otherwise, (2) sublet the Leased Premises or any part thereof, or extend , renew or modify any sublease, or (3) permit the use of the Leased Premises by parties other than Tenant and its employees, whether as licensee, concessionaire, franchisee or otherwise (all of the foregoing shall be hereafter referred to collectively as "Transfers"). Any Transfer made without complying with this Article shall, at Landlord's option, be null, void and of no effect (which shall not be in limitation of Landlord's other remedies hereunder). No Transfer pursuant to this Article shall release Tenant from liability hereunder for the full and complete performance of this Lease and all of the terms and conditions contained herein. Tenant shall reimburse Landlord for its expenses incurred in investigating and approving any Transfer, including reasonable attorney's fees, up to five hundred and no/ Dollars ($500.00).

## ARTICLE 19
### ACCESS BY LANDLORD

Landlord and its authorized representatives may: (1) inspect the Leased Premises in connection with Landlord's required maintenance and repairs or exhibit the Leased Premises to prospective purchasers, lenders, governmental authorities, (2) during the last sixty (60) days of the Term, exhibit the Leased Premises to any prospective tenants, purchasers or brokers, and (3) enter or permit entry to the Leased Premises in emergencies or for any other reasonable purpose, or for the purpose of exercising any of its rights hereunder or to make any repairs, maintenance or improvements to the Center. Landlord shall seek to give Tenant reasonable notice of its intent to enter the Leased Premises, provided, however, that at any time that a representative of Tenant is not present to accompany Landlord, or in case of emergency, Landlord may forcibly enter the Leased Premises without affecting any of the terms or conditions of this Lease and without being liable therefor, provided that Landlord shall repair any damage caused as a result of such entry.

## ARTICLE 20
### DEFAULT AND REMEDIES

A.   **Default:** Each of the following shall be considered to be an "Event of Default" by Tenant:

(1)   Tenant's failure to pay rent as herein provided when due;

(2)   Tenant's failure to perform or observe any other terms, conditions or covenants of this Lease to be performed or observed by Tenant;

(3)   Tenant's vacation or abandonment of the Leased Premises or any failure to keep the Leased Premises open for business in the manner and during Regular Business Hours as provided in Article 7 above;

- 10 -

(4)    The sale of Tenant's leasehold interest hereunder pursuant to execution;

(5)    The adjudication of Tenant as a bankrupt;

(6)    The making by Tenant of a general assignment for the benefit of its creditors;

(7)    The appointment of a receiver in equity for Tenant's property if such appointment is not vacated or otherwise terminated within forty-five (45) days from the date of such appointment;

(8)    The appointment of a trustee, custodian or receiver for Tenant's property in a reorganization, arrangement or other bankruptcy proceeding if such appointment is not vacated or set aside within forty-five (45) days from the date of such appointment;

(9)    Tenant's filing of a voluntary petition in bankruptcy or for reorganization or arrangement;

(10)    Tenant's filing of an answer admitting bankruptcy or agreeing to reorganize or arrangement; or

(11)    Dissolution or if Tenant is a corporation, other termination of Tenant's corporate charter.

B.    **Remedies:** In the event of any default as provided in Paragraph A of this Article 20, and the continuance of such default for a period of five (5) days after due ("Monetary Default"), or in the event of any default of the other terms and conditions of this Lease ("Non-Monetary Default") and the continuance of such default after thirty (30) days written notice from Landlord to Tenant; or in the event of any other default provided for in this Article 20 without any demand or notice, Landlord, in addition to any other rights or remedies at law or equity, may:

(1)    elect to terminate this Lease;

(2)    in the event that Tenant has failed to perform any of its covenants under this Lease other than a covenant to pay rent, perform the covenant or covenants of Tenant which are in default (entering upon the Leased Premises for such purpose, if necessary); and Landlord's performance of any such covenant shall neither subject Landlord to liability for any loss, inconvenience or damage to Tenant nor be construed as a waiver of Tenant's default or of any other right or remedy of Landlord in respect of such default, or as a waiver of any covenant, term or condition of this Lease; or

(3)    immediately re-enter upon the Leased Premises, remove all persons and property therefrom, and store such property in a public warehouse or elsewhere at the sole cost and for the account of Tenant, all without service or notice or resort to legal process, without being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby, and without such re-entry being deemed to terminate the Lease.

To secure the full and complete observance of the obligations and covenants to be observed and performed by Tenant under this Lease, Tenant hereby grants to Landlord a security interest in and to all fixtures, equipment, inventory and all other personal property, tangible or intangible of the Tenant brought or located in or upon the Leased Premises. Tenant shall execute and deliver to Landlord, within five (5) days of Landlord's request therefor, any financing statements or other documentation required by Landlord to perfect its security interest in such property.

- 11 -

C.      Re-Letting: In the event Landlord re-enters upon the Leased Premises pursuant to this Article 20, or takes possession of the Leased Premises pursuant to legal proceedings or pursuant to any notice provided for by law, Landlord may either terminate this Lease, or from time-to-time without terminating this Lease, make alterations and repairs for the purpose of re-letting the Leased Premises and re-let the Leased Premises or any part thereof for such term or terms (which may extend beyond the term of this Lease) at such rental and upon such other terms and conditions as Landlord in its sole discretion deemed advisable. Upon each re-letting, all rentals received from such re-letting shall be applied: first to payment of costs of such alterations and repairs; second, to the payment of rent and any other indebtedness due and unpaid hereunder; and the remainder, if any, shall be held by Landlord and applied in payment of future rent as it becomes due and payable hereunder. If the rentals received from such re-letting during any month are less than amounts to be paid hereunder by Tenant during that month, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. No re-entry or taking of possession by Landlord of the Leased Premises shall be construed as an election to terminate this Lease unless a written notice of termination is given to Tenant. Notwithstanding any re-letting without termination, Landlord may at any time thereafter elect to terminate this Lease for Tenant's previous default. Provided, however, Landlord shall in no event be under any duty whatsoever to attempt to relet the Leased Premises or to otherwise mitigate its damages unless and until all other space within the Shopping Center shall be leased and occupied.

D.      Damages Upon Termination: In the event that Landlord at any time terminates this Lease for any default by Tenant, in addition to any other remedies Landlord may have, Landlord may recover from Tenant all damages Landlord may incur by reason of such default, including costs of recovering the Leased Premises, reasonable attorneys' fees, and the value at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this Lease for the remainder of the Lease Term over the then reasonable rental value of the Leased Premises for the remainder of the Lease Term. All such amounts shall be immediately due and payable from Tenant to Landlord.

E.      Indemnification: Upon any default by Tenant hereunder, Tenant shall be liable for and hereby agrees to pay any and all liabilities, losses, costs and expenses including attorneys' fees incurred by Landlord as a result of Tenant's default and in exercising Landlord's rights and remedies in connection with such default.

F.      Default of Landlord: Landlord shall in no event be charged with default in the performance of any of its obligations under this Lease unless and until Landlord shall have received written notice from Tenant specifying wherein Landlord has failed to perform such obligation or remedy such default, and such default has not been cured after thirty (30) days (or such additional time as is reasonably required to correct any such default) from Landlord's receipt of such notice from Tenant. Tenant agrees that Tenant shall look solely to Landlord's interests in and to the Center, subject to prior rights of any mortgagee of the Center, for collection of any judgment (or other judicial process) requiring payment of money by Landlord in the event of default or breach by Landlord of any of the covenants, terms or conditions of this Lease to be observed or performed by Landlord, and that no other assets of Landlord shall be subject to levy, execution or other process for satisfaction of Tenant's remedies. The term "Landlord" as used in this Lease in relation to covenants, agreements and conditions to be observed and performed by Landlord, shall mean and include only the owner or owners from time-to-time of the Landlord's interest in this Lease and the Center. In the event of any transfer or transfers of such interest (except a transfer for security), the Landlord named herein (or the transferor in the case of a subsequent transfer) shall, after the date of such transfer, be released from all personal liability for performance of any covenant, agreement and condition on the part of the Landlord which are thereafter to be performed hereunder. The transferee shall be deemed to have assumed (subject to the limitations of this paragraph) all of the covenants, agreements and conditions herein to be observed by Landlord with the result that

- 12 -

such covenants, agreements and conditions shall bind the Landlord, its successors and assigns, only during and in respect of their respective successive periods of ownership.

G.    **Late Charges and Interest:** Tenant shall pay, as Additional Rent hereunder, a service charge of two hundred and no/100 Dollars ($200) for bookkeeping and administrative expenses, if any portion of Rent is not received within ten (10) days after it is due. Any amounts due and owing hereunder shall accrue interest at the rate of eighteen percent (18%) per annum until paid in full once such amounts are more than fifteen (15) days over due.

## ARTICLE 21
## INDEMNIFICATION

Tenant shall indemnify and hold Landlord completely harmless from and against any and all claims, liabilities, losses, costs and expenses (including attorney's fees) arising from or in connection with Tenant's use or control of the Leased Premises and any improvements during the Term of this Lease. No indemnity by Tenant shall extend to claims arising by virtue of negligent or wrongful acts or omissions of Landlord or its employees, agents or contractors.

## ARTICLE 22
## HAZARDOUS MATERIALS

Tenant shall not transport, use, store, maintain, generate, manufacture, handle, dispose, release, discharge or spill any "Hazardous Material" (as defined below), or permit any of the same to occur, or permit any Hazardous Materials to leak or migrate, on or about the Center or Premises. The term "Hazardous Material" for purposes hereof shall mean any flammable, explosive, toxic, radioactive, biological, corrosive or otherwise hazardous chemical, substance, liquid, gas, device, form of energy, material or waste or component thereof, including, without limitation, petroleum-based products, diesel fuel, paints, solvents, lead, radioactive materials, cyanide, DDT, printing inks, acids, pesticides, ammonia compounds and other chemical products, asbestos, polychlorinated biphenyls (PCB's) and similar compounds, and any other items that now or subsequently are found to have an adverse effect on the environment or the health and safety of persons or animals or the presence of which requires investigation or remediation under any Law or governmental policy. Without limiting the generality of the foregoing, "Hazardous Material" includes any item defined as a "hazardous substance," "hazardous material," "hazardous waste," "regulated substance" or "toxic substance" under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Sections 9601 *et seq.*, Hazardous Materials Transportation Act, 49 U.S.C. Sections 1801 *et seq.*, Resource Conservation and Recovery Act of 1976, 42 U.S.C. Sections 6901 *et seq.*, Clean Water Act, 33 U.S.C. Sections 1251 *et seq.*, Safe Drinking Water Act, 14 U.S.C. Sections 300f *et seq.*, Toxic Substances Control Act, 15 U.S.C. Sections 2601 *et seq.*, Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. Sections 136 *et seq.*, Atomic Energy Act of 1954, 42 U.S.C. Sections 2014 *et seq.*, and any similar federal, state or local Laws, and all regulations, guidelines, directives and other requirements thereunder, all as may be amended or supplemented from time to time.

Notwithstanding anything to the contrary in the Lease, Landlord shall be solely responsible for, and Tenant shall have no liability with respect to, any Hazardous Materials on, under or within the Premises or the Center not introduced by Tenant or its agents, employees or contractors. Landlord shall indemnify and hold harmless Tenant from and against any liability in connection with Hazardous Materials described in the preceding sentence. Landlord represents that there are no Hazardous Materials presently on, under or within the Premises or the Center. Tenant shall be entitled to maintain small quantities of Hazardous Materials as are permitted by Law and normal for Tenant's Permitted Use (e.g.,

- 13 -

substances contained in batteries, toner for copy machines, etc.) so long as Tenant's use of same are in strict compliance with Laws.

## ARTICLE 23
### SIGNAGE

**A.**    **Approval:** Tenant shall not place or permit to be placed or maintained in or on any portion of the Center outside the Leased Premises or on the glass of any window or door of the Leased Premises (including but not limited to any exterior doors, walls, roof or windows of the building constituting part of the Leased Premises) any sign, awning, canopy decoration, lettering or other advertising matters (hereafter "Signage") that is not in accordance with the provisions of this Article 23.

Prior to opening for business and thereafter throughout the Term, Tenant shall have Signage approved by Landlord, installed and maintained on the Leased Premises in accordance with the provisions of this Article 23 and shall maintain such Signage in good condition, appearance and repair at all times. The design for Tenant's Signage shall be approved in writing by both Tenant and Landlord no later than thirty (30) days after execution of this Lease, and prior to the construction and installation of the Signage. Landlord reserves the right to disapprove any sign design it feels is inappropriate for any reason in its sole discretion.

**B.**    **Canopy Sign Design:** Tenant's signage on the exterior front of the Leased Premises shall be a "Canopy Sign" designed by a graphic artist, consisting of individual, dimensional letters which are internally illuminated and of all metal construction. The design shall specify size, layout and color of these letters and method of installation. Metal letter returns and trim caps shall be of uniform size and color as specified by Landlord.

**C.**    **Installation:** The Canopy Sign shall be installed no later than sixty (60) days after acceptance of design by Landlord. The Tenant shall be solely responsible for the cost of fabrication, installation and maintenance of the Canopy Sign. The electrical sign wiring must be installed in accordance with Underwriters Laboratory Rules and Regulations. All primary and secondary wiring installed through the canopy must be encased in flexible metal conduit or electrical metallic tubing with proper fasteners. All transformers must be concealed in metal transformer boxes and shall be mechanically grounded. After installation, Tenant shall maintain said Canopy Sign in good condition and repair at all times. Tenant shall give Landlord forty-eight (48) hours notice prior to the date of installation of the Canopy Sign.

**D.**    **Illumination:** The Canopy Sign shall be electrically illuminated beginning one-half (1/2) hour after sunset and ending no earlier than 11:00 p.m., seven (7) days per week, or as Landlord shall otherwise determine and so notify Tenant. Landlord reserves the right for the common use and benefit of tenants of the Shopping Center to control the illumination of Tenant's Canopy Sign with a common meter and timer in order to achieve uniformity in lighting.

**E.**    **Consent as to Other Signage:** Any Signage in or on the Leased Premises which may be visible from the exterior of the Leased Premises shall be first approved in writing by Landlord and the location and method of installation of same shall be as designated or approved by Landlord in its sole discretion.

**F.**    **Removal:** Tenant's Signage may be removed by Tenant upon the expiration or earlier termination of this Lease provided that Tenant shall repair any damage to the Leased Premises or the Shopping Center caused by such removal. After the expiration or earlier termination of the Lease,

- 14 -

Landlord shall have the right to remove Tenant's Signage and to have any damage from such removal repaired, all at Tenant's sole cost and expense. Tenant's obligation to pay such expense to Landlord shall survive the expiration or earlier termination of this Lease.

## ARTICLE 24
## NOTICE

Any notice, demand, consent or waiver required or permitted to be given or served by either party to this Lease shall be in writing and shall be deemed to have been duly given if delivered in person or sent by United States certified or registered mail, returned receipt requested, addressed to the other party at the addresses set forth in Article 1 above.

## ARTICLE 25
## MISCELANEOUS PROVISIONS

**A.** **No Waiver:** No waiver of any covenant or condition or the breach of any covenant or condition of this Lease shall be deemed to constitute a waiver of any subsequent breach of such covenant or condition nor justify or authorize a nonobservance upon any occasion of such covenant or condition or any other covenant or condition; nor shall the acceptance of rent by Landlord at any time when Tenant is in default of any covenant or condition be construed as a waiver of such default or Landlord's right to terminate this Lease on account of such default.

**B.** **Remedies Cumulative:** The remedies of Landlord and Tenant hereunder shall be cumulative, and no one of them shall be construed as exclusive of any other or of any remedy provided by law or in equity. The exercise of any one such right or remedy by the Landlord or Tenant shall not impair its standing to exercise any other such right or remedy.

**C.** **Covenant of Quiet Enjoyment:** Landlord agrees that if Tenant performs all the covenants and agreements herein provided to be performed by Tenant, Tenant shall, at all times during the Lease Term, have the peaceable and quiet enjoyment of possession of the Leased Premises without any manner of hindrance from Landlord or any persons claiming under Landlord. This Lease does not guarantee a continuance of light and air over the Leased Premises or any property adjoining the Leased Premises.

**D.** **Accord and Satisfaction:** No payment by Tenant or receipt by Landlord of a lesser amount than the rent herein stipulated, including additional rent and all other sums and charges due under this Lease, shall be deemed to be other than on account of the earliest stipulated rent remaining due and owing; nor shall any endorsement or statement on any check or letter accompanying any check or payment as rent be deemed an accord and satisfaction; and Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such rent or to pursue any other remedy provided in this Lease.

**E.** **No Option:** The submission of this Lease for examination by Tenant shall not constitute a reservation of or option for the Leased Premises. This Lease shall become effective as a Lease only upon execution and delivery thereof by Landlord and Tenant.

**F.** **Memorandum of Lease:** The parties hereto shall not record this Lease but each party shall execute upon the request of the other a "Memorandum of Lease" suitable for recording.

- 15 -

G.    **Relationship of Parties:** Nothing contained herein including, but not limited to, the method of computing rent, shall be deemed or construed by the parties hereto or by any third party as creating between the parties hereto the relationship of principal and agent, partnership, joint venture, or any relationship other than the relationship of lessor and lessee.

H.    **Severability:** The invalidity or unenforceability of any particular provision of this Lease shall not affect the other provisions, and this Lease shall be construed in all respects as if such invalid or unenforceable provision had not been contained herein.

I.    **Benefit of Persons Affected:** This Lease and all of the terms and provisions hereof shall inure to the benefit and be binding upon the respective heirs, executors, administrators, successors and assigns of Landlord and Tenant except as otherwise expressly provided herein.

J.    **Construction:** Whenever in this Lease a singular word is used, it shall also include the plural wherever required by the context and vice-versa. All references in this Lease to periods of days shall be construed to refer to calendar, not business days.

K.    **Entire Agreement; Amendments:** This instrument contains the entire agreement between the parties hereto with respect to the subject matter hereof. All representations, promises and prior or contemporaneous undertakings between such parties are merged into and expressed in this instrument, and any and all prior agreements between such parties are hereby cancelled. The agreements contained in this instrument shall not be amended, modified, supplemented except by a written agreement duly executed by both Landlord and Tenant.

L.    **Governing Law:** This Lease has been executed under and shall be governed in accordance with the laws of the State of Indiana.

M.    **Captions:** The captions of this Lease are for convenience only and do not in any way limit or amplify the terms and provisions of this Lease.

N.    **Counterparts:** This Lease may be executed in separate counterparts, each of which when so executed shall be an original; but all of such counterparts shall together constitute but one and the same instrument.

O.    **Authority:** The persons executing this Lease on behalf of Landlord and Tenant hereby warrant that they have full power and authority to do so. Tenant and Landlord shall deliver appropriate evidence of such authority to the other upon request.

P.    **Force Majeure:** In the event that Landlord shall be delayed or hindered in or prevented from doing or performing any act or thing required in this Lease by reason of strikes, lock-outs, casualties, Acts of God, labor troubles, inability to procure materials, failure of power, governmental laws or regulations, riots, insurrection, war or other causes beyond the reasonable control of Landlord, then Landlord shall not be liable or responsible for any such delays and the doing or performing of such act or thing shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided however, notwithstanding the foregoing, Tenant shall pay to Landlord all monetary amounts when due under this Lease.

Q.    **Lease Review:** This Lease is submitted for Tenant's review and may be withdrawn by Landlord at any time prior to Landlord delivering fully executed leases to Tenant.

- 16 -

R.  Security Measures: Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Leased Premises or the Center. Tenant assumes all responsibility for the protection of Tenant, its agents, and invitees and the property of Tenant and of Tenant's agents and invitees from acts of third parties. Nothing herein contained shall prevent Landlord, and Landlord's sole option, from providing security protection for the Shopping Center or any part thereof, in which event of the cost thereof shall be included within the definition of Common Areas Costs, as set forth in Article 4.

S.  Relocation: If the Leased Premises contains less than two thousand (2,000) square feet of gross leaseable area, Landlord shall have the right, at its option, upon at least thirty (30) days' written notice to Tenant, to relocate Tenant and to substitute for the Leased Premises described above other space in the Shopping Center containing at least as much rentable area as the original Leased Premises. Such substituted Leased Premises shall be improved by Landlord at its expense, with decorations and improvements at least equal in quantity and quality to those in the original Leased Premises. Landlord shall pay the expenses reasonably incurred by Tenant in connection with such substitution of Leased Premises, including, but not limited to, costs of moving, door lettering, telephone relocation and reasonable quantities of new stationery.

T.  Commissions: Tenant represents that it has had no dealings, negotiations or consultations with any broker, representative, employee, agent or other intermediary other than Chris Yang of The Central Company in connection with this Lease. Tenant shall indemnify, defend and hold harmless Landlord from all loss, damage, cost or expense, including attorneys' fees, arising out of the claim of any other broker, representative, employee, agent or other intermediary claiming to have represented Tenant or to be entitled to compensation in connection with the execution of this Lease. Tenant further acknowledges that should this Lease hereinafter be renewed, Landlord shall not be responsible to pay any additional brokerage commissions to real estate brokers representing Tenant's interests in such Lease renewal, and Tenant shall be solely responsible to pay any such commissions.

U.  Terrorism and Anti-Money Laundering: Tenant covenants, represents and warrants that:

(1)  As of the date hereof and throughout the Term:  (i) Tenant; (ii) any person or entity controlling or controlled by Tenant; (iii) if Tenant is a privately held entity, any person or entity having a beneficial interest in Tenant; or (iv) any person or entity for whom Tenant is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person, as herein defined.

(2)  To comply with applicable Anti-Money Laundering Laws, as herein defined, all payments by Tenant to Landlord of from Landlord to Tenant will only be made in Tenant's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 W.S.C. § 5311, et seq.), as amended and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time.

(3)  Tenant agrees to provide Landlord at any time and from time to time during the Term with such information as Landlord reasonably determines to be necessary or appropriate to comply with the Anti-Money Laundering Laws or any applicable jurisdiction, or to respond to requests for information concerning the identity of Tenant, any person or entity controlling or controlled by Tenant or any person or entity having a beneficial interest in Tenant, from any governmental authority, self-regulating organization or

financial institution in connection with its anti-money laundering compliance procedures, or to update such information.

The term "OFAC Prohibited Person" means, a country, territory, individual or entity (i) listed on, included within or associated with any of the countries, territories, individuals or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals or entities referred to in or prohibited by OFAC or any other Anti-Money Laundering Laws, or (ii) which is obligated or has any interest to pay, donate, transfer or otherwise assign any property, money, goods, services, or other benefits from any of its assets, directly or indirectly, to any countries, territories, individuals or entities on or associated with anyone on such list or in such laws.

The term "Anti-Money Laundering Laws" means the USA Patriot Act of 2001, he Bank Secrecy Act, as amended through the date hereof, Executive Order 13324 – Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by the United States Department of Treasury, Office of Foreign Assets Control ("OFAC") which prohibit, among other things, the engagement in transactions with and the provision of services to, certain foreign countries, territories, entities and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

**V.  First Months Rent and Security Deposit due upon Lease signing  ($14,262.50)**

IN WITNESS WHEREOF, the parties have set their hands effective as of the date first set forth above.

Landlord hereby allows
Tenant use of the remaining
property and equipment
currently located in the premises
of 11300 Chamberlain Lane
(formerly Ocean Buffet). If
anyone lays claim to
aforesaid property and
equipment (with proper
proof) then Asian Buffet
agrees to relinquish
said equipment and
property.

KJS, LLC, d/b/a Chamberlain Plaza
an Indiana limited liability company

By: _____
        Craig A. May, Manager

"Landlord"

Asian Buffet Group,
Hua Lin, Guarantor

By: _____

Its: _____

"Tenant"

- 18 -

EXHIBIT "A"     SPACE PLAN



19

EXHIBIT "B"

LANDLORD'S WORK

EXHIBIT "C"

PROHIBITED USES

EXHIBIT "D"

SHOPPING CENTER RULES AND REGULATIONS

Each Tenant shall at all times:

1.    Use, maintain, and occupy its Premises in a careful, safe, proper and lawful manner and keep its Premises and its appurtenances in a clean and safe condition. Keep the Premises in a clean, orderly and sanitary condition, free of insects, rodents, vermin, or other pests. Take good care of the Premises and keep the same free from waste or nuisance at all times. Tenant shall keep the Premises, including show windows, signs, sidewalks, service ways, and loading areas adjacent to the Premises neat, clean, and free from dirt or rubbish at all times, and shall store all trash and garbage within the Premises or such other area designated by Landlord. Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only by way of the service entrance, if any, and subject to such regulations as Landlord may from time to time prescribe.

2.    Keep all glass and doors and windows of its premises in clean and good repair. Light the show windows and exterior signs of its Premises to the extent required by Landlord. Not use show windows in its Premises for any purpose other than display of merchandise for sale in a neat and attractive manner. Keep all display windows and exterior electric signs of the premises lighted from dusk until at least 9:00 p.m. on each business day and on any holidays during which stores in the Center are open for business. Not erect any kind of sign or other material visible from the exterior of the Premises nor make any penetrations of the roof without in each case securing the prior written approval of Landlord.

3.    Not place, maintain, or sell any merchandise in any vestibule or entry to its Premises, on the sidewalks adjacent to the leased premises, or elsewhere on the outside of its Premises, without the prior written consent of the Landlord, nor shall any tenant obstruct or place anything in or about the areas herein referred to.

4.    Not permit undue accumulations of garbage, trash, rubbish, and other refuse in or about its Premises, and keep refuse in closed containers within the interior of its premises until removed; Landlord may, if it chooses, in order to facilitate the systematic and orderly removal of such refuse and rubbish, and in order to coordinate the hours during which such service is performed for the various tenants and the use of any loading areas, from time to time select one or more independent contractors for the removal of refuse and rubbish as well as establish procedures for the handling of such refuse and rubbish in common containers for all tenants. Promptly comply with all health, sanitary, and other laws and ordinances in the placing, depositing, handling and removal of such materials from the Premises and from the Center. All of the above including the prompt and regular removal of such materials from the Premises and from the Center, shall be done by Tenant and at its own cost and expense. Landlord shall have the right to designate from time to time, reasonable places in or adjacent to Center where Tenant shall place and deposit garbage, trash, waste paper, dirt and other like materials.

5.    Not deliver or suffer delivery of merchandise to the front entrance of its Premises after 10:00 a.m. on any day.

6.    Not solicit business in the Common Areas of the shopping center or distribute handbills or other advertising materials in the Common Areas, without the prior written consent of the Landlord, and if this provision is violated, the Tenant shall pay the Landlord the cost of collecting same from the Common Areas for trash disposal.

7.    Not use the plumbing facilities in its Premises for any purpose other than that for which they were constructed, or dispose of any foreign substances therein, whether through the utilization of "garbage disposal" units or otherwise. If Tenant uses it premises for the sale, preparation or service of food for on-premises or off-premises consumption, Tenant shall, at Tenant's sole cost and expense, install such grease-traps as Landlord shall deem necessary or desirable to prevent the accumulation of grease or other wastes in the plumbing facilities serving the premises. All cost required in the maintenance of any such grease-trap shall be borne by Tenant.

8.    Not operate in its Premises or in any of the shopping center any coin operated vending machine or similar device for the sale of any merchandise or service without the prior written consent of Landlord.

9.    Use its best discretion in assigning employee parking so as not to interfere or take choice Tenant spaces to be used by customer. Agrees that parking for trucks, autos, bicycles, scooters, and all kinds of vehicles owned or used by Tenant or Tenant's employees shall be restricted to areas designated from time to time by Landlord and Tenant agrees that Landlord may designate employee's parking areas outside the limits of Center, the same to be within a reasonable distance of the Premises as determined by Landlord.

10.    Not keep anything within the Premises or use the Premises for any purpose which increases the insurance premium cost or invalidates any insurance policy carried on the Premises or on other parts of the Center

Tenant shall not keep, store, release or improperly dispose of any hazardous materials, toxic waste products, gasoline or petroleum products or any other substances which could cause environmental contamination.

11.    Not conduct in or about the Premises any fire sales, auction, or bankruptcy sales; not display any merchandise or conduct any sales operations upon the sidewalks or other areas adjacent to the Premises, not permit any objectional or unpleasant odors to emanate from the Premises; not place or permit any radio television or other antenna, loud speaker or amplifier on the roof or outside the Premises or where the same can be seen or heard from outside the Premises; not take any other action which would disturb or endanger other tenants of the Center or interfere with their use of their respective Premises.

12.    .Not at any time leave the Premises vacant, but shall in good faith continuously throughout the term of this Lease conduct and carry on in the Premises such business.  Tenant shall operate its business in an efficient, high class, and reputable manner so as to produce the maximum amount of sales from the Premises, and shall, except when prevented by circumstances beyond Tenant's control and during reasonable periods for repairing, cleaning and decorating, keep the Premises open to the public for business on all business days during the hours customary for such type of business.

In these rules and regulations, "Tenant" includes the employees, agents, invitees and licensees of Tenant and others permitted by Tenant to use or occupy its premises.

Landlord reserves the right to make such other Rules and Regulations or change, modify or amend these Rules and Regulations as in Landlord's judgement may from time to time be necessary for the care and cleanliness of the Premises and for the preservation of good order of the shopping center.

Tenant hereby agrees to the foregoing Rules and Regulations as an integral part of the referenced lease documentation

_____
Tenant

_8/1/06_____
Date

## Exhibit E

## UNCONDITIONAL GUARANTY

IN CONSIDERATION OF THE SUM OF ONE DOLLAR AND NO CENTS, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the execution by KJS, LLC d/b/a Chamberlain Plaza   ("Landlord") and of that certain Lease Agreement ("Lease") with Hua Lin of 130 W. Tiverton Way, #109, Lexington KY 40503 ("Tenant") on the 17th day of July, 2006, the undersigned, ("Guarantor"), hereby guarantees to the Landlord the full and prompt payment of Minimum Annual Rent (as defined in the Lease) and any and all other sums and charges payable by Tenant under the Lease (herein collectively referred to as "Rent") and hereby further guarantee the full and timely performance and observance of all the covenants, terms, conditions, and agreements therein provided to be performed and observed by Tenant; and the Guarantor hereby covenants and agrees with Landlord that, if an Event of Default shall at any time be made by Tenant in the payment of any Rent, or if Tenant should cause an Event of Default in the performance and observance of any of the terms, covenants, provisions, or conditions, contained in the Lease, the Guarantor shall and will forthwith pay the Rent to Landlord and any arrears thereof, and shall and will forthwith faithfully perform and fulfill all such terms, covenants, conditions, and provisions set forth in such Lease to be performed and fulfilled by Tenant, and will forthwith pay to Landlord all damages that may arise in consequences of any Event of Default by Tenant under the Lease, including, without limitation, all reasonable attorney's fees and disbursements incurred by Landlord or caused by any such Event of Default and/or by the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional Guaranty of payment and of performance. It shall be enforceable against the Guarantor without the necessity of any suit or proceeding on Landlord's part of any kind or nature whatsoever against Tenant, and without the necessity of any notice of non-payment, nonperformance, or non-observance or of any notice of acceptance

of Guaranty or of any other notice or demand to which the Guarantor might otherwise be entitled, all of which the Guarantor hereby expressly waives; and the Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall in no way be terminated, affected, diminished, or impaired by reason of the assertion or the failure to assert by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.

This Guaranty shall be a continuing Guaranty, and the liability of the Guarantor hereunder shall in no way be affected, modified, or diminished by reason of any assignment, renewal, modification, or extension of the Lease or by reason of any modification or waiver of or change in any of the terms, covenants, conditions, or provisions of the Lease by Landlord and Tenant, or by reason of any dealings or transactions or matter or thing occurring between Landlord and Tenant, or by reason of any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit or creditors, receivership, or trusteeship affecting Tenant, whether or not notice thereof shall be given to the Guarantor.

All of Landlord's rights and remedies under the Lease or under this Guaranty are intended to be distinct, separate, and cumulative, and no such right or remedy therein or herein mentioned is intended to be in exclusion of or a waiver of any of the others.
Whenever used in this Guaranty, the terms Guarantor, Landlord, and Tenant shall include the respective successors and assigns of the party named as such. As used herein, the plural shall include the singular and the singular shall include the plural.

As a further inducement to Landlord to make and enter into the Lease and in consideration thereof, Landlord and the Guarantor covenant and agree that in any action or proceeding brought on the Guaranty, Guarantor shall and does hereby waive trial by jury. This Guaranty shall be construed in accordance with the laws of the State of Indiana.

2

IN WITNESS WHEREOF, the undersigned has caused this Unconditional Guaranty to be executed as of the _____ day of _8 / 0 /_____, 2006.

_____Lin Hua_____, Individually

PLEASE PRINT

GUARANTOR NAME: _Lin Hua_____

HOME ADDRESS: _24 James St #1A___
_New York N.Y. 10038___

HOME TELEPHONE: _(917) 903 - 2735___

SOCIAL SECURITY #:  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

3

# Exhibit B

7908 C



Donald J. Smith
dsmith@lewiswagner.com

Skilled Advocacy.  Practical Solutions.™

July 5, 2007

Robert F. Wagner
Thomas C. Hays
John C. Trimble
Kenneth P. Reese
Sharon F. Murphy
Jarrell B. Hammond
Mary Foley Panszi
Susan E. Mehringer
Tammy J. Meyer
Daun A. Weliever
Richard K. Shoultz
Dina M. Cox
Anthony M. Eleftheri
A. Richard M. Blaiklock
Robert R. Foos, Jr.
Kyle A. Lansberry
Stefanie R. Crawford
Stephanie L. Cassman
Sonia C. Das
Valerie L. Hughs
Donald J. Smith
Ryan K. Gardner
Shannon L. Logsdon
Lewis S. Wooton
Brett Y. Hoy

Of Counsel:
Felson Bowman
David Konnersman
Lisa M. Dillman

Edward D. Lewis
1922-1996

Judith T. Kirtland
1947-1990

Mark E. Walker
1969-2000

**Via Certified Mail**
**Return Receipt Requested and**
**Regular United States Mail**
Asian Buffet Group
c/o Mr. Hua Lin
130 W. Tiverton Way, #109
Lexington, Kentucky 40503

**Certified Article Number**
**7160 3901 9849 4260 3316**
**SENDERS RECORD**

**Via Certified Mail**
**Return Receipt Requested and**
**Regular United States Mail**
Mr. Hua Lin
24 James Street, Apt. 1A
New York, New York 10038

**Certified Article Number**
**7160 3901 9849 4260 3325**
**SENDERS RECORD**

Re:    Retail Lease Agreement, dated August 1, 2006 (the "Lease") by and
between KJS, LLC and Asian Buffet Group ("Tenant") and Hua Lin
("Guarantor") for certain real estate located at 11300 Chamberlain Lane,
Louisville, Kentucky (the "Leased Premises")

Dear Mr. Lin:

The undersigned is counsel for KJS, LLC ("Landlord") as it relates to the above-
referenced Lease.

We have been notified that you are in default of the Lease for failure to make
monthly payments of rent, and for failure to remain open continuously, both pursuant to
the terms and conditions of the Lease.  We are advised that, as of the date of this letter,
there is currently an amount due and owing Landlord in the amount of $35,096.55, plus
late fees, interest and attorney's fees.

Pursuant to the terms of Article 20(B) of the Lease, demand is hereby made upon
both Tenant and Guarantor for the immediate payment of the above-referenced amount.
Please remit such payment within five (5) days of the date of this letter to my attention at
the address listed below:

501 Indiana Avenue Suite 200 Indianapolis, Indiana 46202-6150
tel 317.237.0500 fax 317.630.2790  toll free 1.800.237.0505
www.lewiswagner.com


**LEWISWAGNER** LLP
Attorneys at Law

Asian Buffet Group
Mr. Hua Lin
July 5, 2007
Page 2 of 2

Donald J. Smith, Esq.
Lewis Wagner, LLP
501 Indiana Avenue, Suite 200
Indianapolis, Indiana 46202

Should you fail to remit such amount to the undersigned within five (5) days of the date of this letter, Landlord has instructed us to pursue all legal and equitable remedies available to it against Tenant and Guarantor pursuant to the Lease and Indiana law.

In addition, please be advised that Landlord was forced to enter onto the Leased Premises to deal with rotting food that was left in the Leased Premises when Tenant vacated. Pursuant to Article 20(B)(3) of the Lease, Landlord has terminated Tenant's right to possession of the Leased Premises, effective as of the date of this letter. Any entry into the Leased Premises from the date of this letter forward shall require the permission of Landlord and must be arranged at least twenty-four (24) hours in advance.

Nothing contained herein shall constitute a waiver of any right or remedy Landlord may have with respect to this matter, nor shall anything herein constitute a termination of the Lease, and all such rights and remedies are preserved and not waived.

Very Truly Yours,

LEWIS WAGNER, LLP

DONALD J. SMITH

DJS/lk
cc:    Craig A. May (via e-mail)
       Lisa Held (via e-mail)